UNITED STATES v. NORTHERN PAC. TERMINAL CO.

(Circuit Court, D. Oregon. April 28, 1911.)

Nos. 3,216, 3,217, 3,218, 3,219, 3,220.

1. CARRIERS (§ 211*) — TRANSPORTATION OF CATTLE — TWENTY-EIGHT HOUR LAW.

The time consumed in loading and unloading stock is not to be considered as a part of their confinement in the cars permitted by the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]).

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 926–928; Dec. Dig. § 211.*]

2. CARRIERS (§ 37*)—TRANSPORTATION OF CATTLE—TWENTY-EIGHT HOUR LAW —CONNECTING CARRIERS.

Where connecting carriers are engaged in a continuous transportation of cattle in interstate commerce, the fact that the initial carrier had kept the cattle confined without unloading for a period longer than that authorized by the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]), when they were delivered to defendant, the connecting carrier, did not authorize the latter to confine the cattle for another period equal to the statutory time before it would be liable for violating the act, since, while there is no violation of the act so long as the carrier does not exceed the time fixed, yet, whenever the continuous carriage without unloading does exceed it, then every carrier forming any part of an interstate line over which the stock is being shipped that participates in such carriage beyond the limit is guilty of an independent offense.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*]

3. CARRIERS (§ 37*)—CONNECTING CARRIERS—TRANSPORTATION OF CATTLE— TWENTY-EIGHT HOUR LAW—TERMINAL COMPANY.

Where a terminal company's railroad formed a part of a continuous line of interstate transportation over which live stock was transported, and the animals had been confined in the cars without being unloaded for food, water, and rest for a period longer than that prescribed by the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]), before being delivered to the terminal company for transportation to the stockyard for unloading, the terminal company could not relieve itself from liability for continuing such transportation on the ground that it found the cattle so confined at a place where they could not be unloaded except by being taken to the stockyards, nor except in exceptional cases, because its violation of the law would subserve a humane purpose; the terminal company being under no obligation to accept the cattle from its connecting carrier under such circumstances.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*]

4. CARRIERS (§ 37*)—TRANSPORTATION OF LIVE STOCK—TWENTY-EIGHT HOUR LAW—PRINCIPAL AND AGENT.

A terminal railroad company, though controlled by associated railroads for which it operated terminal yards, was nevertheless a distinct corporation and separate entity from any of such associated railroads. The terminal company operated under a contract providing that its employés should be regarded as the servants of the associated railroad companies during the time they were working for them. One of such companies, after having retained certain cattle transported in interstate commerce in the cars for a time longer than that authorized by the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909,

p. 1178]), turned over the cattle to the terminal company, which continued the transportation to the stockyards where the cattle were unloaded. *Held*, that the fact that the original company was convicted and fined because of such transportation did not relieve the terminal company from its violation of the act on the theory that it was acting merely as an agent of the initial carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*]

Action by the United States against the Northern Pacific Terminal Company to recover penalties for an alleged violation of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]). Judgment for plaintiff.

John McCourt, U. S. Atty.

Dolph, Mallory, Simon & Gearin, for defendant.

WOLVERTON, District Judge. Five cases instituted by the government against the Northern Pacific Terminal Company to recover for violation of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]) upon five shipments of beef cattle have been consolidated. The cattle were carried by the Southern Pacific Company in two train loads from Gazelle, in the state of California, to Portland, Ore., being destined to Tacoma, Wash. The Terminal Company received and carried them to the Union Stockyards, where they were unloaded for rest, food, and water. One train load, containing two shipments, was 34 hours and 45 minutes in transit to Portland. Accompanying these were written requests to extend the time for confining the stock in cars to 36 hours. Another train load, comprising three shipments was 36 hours and 10 minutes in transit. The Terminal Company had the first train load in transit 1 hour and 55 minutes, making a continuous carriage of the cattle without unloading of 36 hours and 40 minutes. It had the second load in transit 50 minutes, making a continuous carriage of 37 hours. The distance from the point where the Terminal Company received the stock from the Southern Pacific Company to the Union Stockyards is about 1,000 feet. The Terminal Company maintains terminal facilities at Portland for the use of the Northern Pacific Railway Company, the Oregon Railroad & Navigation Company, and the Southern Pacific Company, they owning the capital stock of the Terminal Company and bearing proportionally the expenses of conducting the terminal yards. All interstate shipments by any one of these railroad companies to be carried also over the lines of another are delivered to such other through the yards of the Terminal Company. The Terminal Company issues no bills of lading or shipping receipts, and receives none to itself, and neither charges nor receives freight, but in all such relations acts solely at the request and direction of the company so delivering or receiving the shipment. The terminal yards consist of 38 acres of land in area, over which the Terminal Company maintains tracks and switches, running the distance of about 3,000 feet. The Union Stockyards are adjacent to these tracks. The cattle in question were received by the Terminal Com-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pany for the purpose of transporting the same to the stockyards for unloading and rest before forwarding them to destination by connecting carrier under instructions from the Southern Pacific Company, and such transportation and unloading were done pursuant to the provisions of an agreement among the several railroad companies for whose use the Terminal Company is maintained, by the terms of which the employés of the Terminal Company are deemed to be the separate employés for the time being of the railroad company for which the Terminal Company is acting. The Terminal Company, upon receiving the cattle from the Southern Pacific Company, promptly switched the cars containing them to and upon the tracks entering the Union Stockyards, and without unnecessary delay unloaded the same. The Terminal Company was notified and informed by the chief dispatcher of the Southern Pacific Company before the former received the cattle from the latter as to the length of time the latter had same in transportation. The Southern Pacific Company has been prosecuted for a violation of the law as to each of the five shipments, and has paid a fine.

Upon these facts, which are in substance as stipulated, the question of the liability of the Terminal Company also to prosecution under the act is presented.

Apparently there is some mistake respecting the prosecution of the Southern Pacific Company for the two shipments by the first train load designated above, as the company was not legally liable therefor, by reason of the extension of time for confinement of the cattle by request of the shipper. In reality, there had not been 36 hours of continuous carriage when the Terminal Company received the cattle; but, adding the two periods named, the time in which the Southern Pacific Company had the stock in transit and that consumed by the Terminal Company in delivering to the stockyards, 36 hours and 40 minutes elapsed, being 40 minutes in excess of the time limited by law. As it pertains to the second train load, there had been a continuous carriage of more than 36 hours before taken in charge by the Terminal Company.

Four objections are interposed against the prosecution, which will be considered in the order adopted by counsel.

[1] First. It is urged that the time consumed in loading and unloading stock is not to be considered as a part of the time of confinement in cars. This is undoubtedly a sound construction of the law. But the allegation of the complaint as to each of such shipments is that the cattle were confined in transit for more than 36 consecutive hours, namely, in the one case 36 hours and 40 minutes, and in the other 37 hours, without unloading, and this is admitted by the stipulation to be true. The language of the stipulation is as follows:

"That said cattle were not unloaded from the time of reloading at Gazelle, California, as set forth in said amended complaint, until they were placed by the Terminal Company in the stockyards at Portland, as stated in said amended complaint."

This objection is therefore not well taken.

[2] Second. Counsel say:

"The time limit as fixed by the act had already expired when the cattle were received by the defendant. That constituted violation of the act. Recovery has been had for the offense against the act thereby committed, and the time thus accounted for cannot be charged against this defendant."

The time limit had undoubtedly run as to the three shipments comprising the second train load, but not as to the two shipments by the first, whatever might have been done towards prosecuting the Southern Pacific Company for its part in the carriage. But, conceding the fact, I am unable to agree with counsel that because the offense had been committed by the Southern Pacific Company, and prior to the time when the stock was received in charge by the Terminal Company, the latter company is not amenable for what it did in continuing the carriage. The act includes all carriers and connecting carriers. If it be that one carrier has held stock in transit for less than the time limit, and delivers to another who continues the transportation, so that the combined time of carriage would exceed such limit, although the latter may not have carried for the full limit, it would undoubtedly be liable, if it had knowledge of the time consumed in carriage by the former. This must be conceded. Otherwise the law would be in many instances a dead letter. In such a case, the first carrier would not be liable, because he would not have been concerned in confining the stock for a longer time than limited by law. But suppose the first carrier has held stock in transit for more than the statutory time, and then delivers to another carrier who continues the transportation for 27 hours longer, with knowledge of what preceded, would not the latter, being a connecting carrier, be concerned in carrying stock for a longer time than the law has prescribed, and would he not be just as guilty as the carrier who took up stock that had not been carried the limit as to time, and carried beyond such limit counting the combined time of carriage? Manifestly there is no escape from the conclusion. Suppose, again, that stock confined in cars has passed in transit through and upon the lines of three connecting carriers. Let the time consumed in passing over the first be 27 hours, that over the second 3 hours, and that over the third 27 hours, all continuous and with full knowledge of what had been previously done; could it be said that the second alone is liable in the carriage of the stock so confined for a period of 57 hours, more than double the time limit? The illustration may be varied so that each would carry 27 hours, totaling 81 hours continuous confinement of the stock, and yet could it be that only one of these carriers would be liable? The purpose of the statute is perfectly manifest. It is to inhibit any railroad company whose road forms any part of a line of road over which stock shall be conveyed from one state or territory into or through another from confining such stock in cars for a greater length of time than therein specified, without unloading for rest, feed, and water. There is no violation of the law so long as the carriage does not exceed the time fixed, but, whenever the continuous carriage without unloading does exceed the limit, then every railroad company forming any part of an interstate line, over which such stock is being shipped, that participates in such

carriage beyond the limit, acts in contravention of the law. The deduction seems logical, and to follow as of course. Now, can it make any difference that any one of the railroad companies whose lines form a connecting link in the route of shipment has violated the law and been fined, if a company whose railroad forms a succeeding link in the through line also carries with knowledge that the stock has been in cars longer than the time fixed by law? The one participates in so carrying the stock as well as the other, and does so contrary to the inhibition of a direct statute. Why is not the one as guilty as the other? I am of the firm opinion that the true intendment of the statute is to make all carriers amenable thereto who participate in the carriage of stock in cars beyond the time limit for unloading. The liability is a several one, and all that have had a hand in the carriage beyond the time limit are alike guilty of the offense denounced. My attention has been called to a contrary holding in the case of United States v. Stockyards Terminal Co. (C. C.) 172 Fed. 452, but, with all due respect for the opinion of the learned judge who decided that case, I am unable to agree with him. See opinion of Attorney General hereafter cited.

[3] Third. It is insisted that, finding the cattle so confined at a place where they could not be otherwise unloaded for rest, water, and feed, except by being taken to the stockyards, it became the Terminal Company's humane duty to carry them to the stockyards for unloading. It must be borne in mind in this case, as will appear later on, that, while the Terminal Company was carrying the stock to the stockyards, it was also carrying it over one link of the through line of transportation from Gazelle, Cal., to Tacoma, Wash., and I find no such exception in the law that a connecting carrier may carry stock on to stockyards, although the same has been confined beyond the limit of time, for the purpose of releasing such stock. Nor is the Terminal Company excusable in violating the law that it might subserve a humane purpose, unless it be in exceptional cases. The enforcement of the law will be better subserved if connecting carriers will refuse to carry any stock that has been confined in cars by a preceding carrier beyond the time limit. Indeed, as I interpret the statute, they violate the law if they do not so refuse. The Terminal Company could not be made amenable to the state law for prevention of cruelty to animals so long as it did not have charge or was not in possession of the stock. It was not bound to take it from the possession of the Southern Pacific Company. The dilemma was that company's, and none other was called upon to relieve it. Hence I hold that the Terminal Company rendered itself liable when it assumed possession for the purpose of forwarding the stock on its way to destination.

[4] Fourth. The point here made is that the defendant was acting as the agent of and under the direction of the Southern Pacific Company, and, the principal having been recovered against, this action cannot be maintained. This objection is answered in part under the second point. The further answer is that the Terminal Company is a distinct corporation and entity from any of the associate railroad

companies for which it operates its terminal yards, and is not specially controlled in its action by any of such associate companies. While it does the switching for said companies, and this possibly in the capacity of an agent, it has a distinct function to perform, and that it performs in its own way, and as it can at its own behest. Almost the identical question arose through the action of the St. Louis Merchants' Bridge Terminal Railway Association, and was submitted to the Honorable W. H. Moody, Attorney General, for his decision. The National Stockyards lie directly across the Mississippi river from St. Louis, Mo. The St. Louis Merchants' Bridge Terminal Company is a distinct corporation, but controlled by the Terminal Railroad Association of St. Louis, Mo., by reason of the latter company's ownership of a majority of the capital stock. By means of its owned, operated, and leased lines the Terminal Railroad Association is the only company which can transport live stock from St. Louis to the National Stockyards, the run to which is made in from one to three hours. Answering the Secretary of Agriculture under this state of facts, the Attorney General says:

"You state: 'The view of the officers of the department having the matter in charge has been that any railroad company whose road forms any part of a line over which live stock is conveyed from one state to another which confines said live stock in cars for a period longer than 28 consecutive hours without unloading the same for rest, water, and feeding for a period of at least 5 consecutive hours, unless prevented from so doing by storm or other accidental causes, or unless the live stock is carried in cars in which it can and does have opportunity for feed, rest, and water, is a violator of the law; further, that, following the plain language of the statute, the time during which the animals have been confined without such rest on connecting roads from which they are received shall be included in estimating such confinement.' I concur in this interpretation of the law, and upon the facts stated it is my opinion that the law applies to these terminal railroad companies. The statute is unambiguous, and is clearly designed to prevent any 'railroad company within the United States whose railroad forms any part of a line of road over which cattle, sheep, swine, or other animals are conveyed from one state to another,' from transporting such animals under conditions other than those set forth in the statute. It seems to be clear from your statement of the facts that these terminal companies accept stock for transportation to the National Stockyards that·has already been confined for more than 28 consecutive hours without unloading for feed, rest, and water. That being so, the companies are undoubtedly liable for the penalty which the statute provides." Circular No. 27, U. S. Department of Agriculture, issued December 10, 1909.

To the same purpose is the holding of the United States Court of Appeals for the Eighth Circuit. Union Stockyards Co. v. United States, 169 Fed. 404, 94 C. C. A. 626. See also United States v. Sioux City Stockyards Co. (C. C.) 162 Fed. 556. It has been held by this court that this Terminal Company is a connecting carrier within the purview of the safety appliance act while engaged in moving cars used in interstate traffic. United States v. Northern Pac. Terminal Co. (D. C.) 144 Fed. 861. However, it has been recently held by the Supreme Court that the shipment does not constitute the integer contemplated by the statute as the objective thing to which the offense relates, as has been supposed, but that the time of confinement, regardless of ownership or consignment, determines the offense. For instance, the loading of numerous cars might proceed concurrently, and

this of stock belonging to different parties and under different consignments, and if not discontinuous or unduly prolonged, the period of lawful confinement on the same train would end at the same time and place, and, if carried beyond that time, there would be but one offense. Baltimore & Ohio Southwestern Railroad Company v. United States, 220 U. S. 94, 31 Sup. Ct. 368, 55 L. Ed. ——, Advance Sheets Sup. Ct. of U. S., decided March 20, 1911. This was practically what happened in loading at Gazelle, Cal., and under the decision cited there would be but two offenses for which the Terminal Company would be liable in the present controversy.

As the Southern Pacific Company has been heretofore prosecuted for its part in the carriage of these cattle beyond the lawful period, the lightest penalty should be imposed here, namely, $100 in each of said two offenses.